IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JON MARTIN, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br>v.<br><br>UNITED INDUSTRIES CORPORATION and SPECTRUM BRANDS, INC.,<br><br>       Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jon Martin ("Plaintiff"), by and through his attorneys, make the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge, against Defendants United Industries Corporation and Spectrum Brands, Inc. ("Defendants").

## NATURE OF THE ACTION

1. This is a class action lawsuit on behalf of purchasers of the Hot Shot Bedbug & Flea Fogger (the "Product") in the United States.

2. The Product prominently advertises on the front panel of the packaging that it "KILLS BED BUGS." Moreover, the Product is called "Bedbug & Flea Fogger," suggesting to a reasonable consumer that the Product has particular application to the eradication of bed bugs.

1



3. Unfortunately for consumers, however, the Product is a sham and is worthless because it is ineffective for its intended purpose of killing bed bugs.

4. In fact, a 2012 study conducted by researchers at the Department of Entomology at the Ohio State University, titled *Ineffectiveness of Over-the-Counter Total-Release Foggers Against the Bed Bug (Heteroptera: Cimicidae)*, found that there was "strong evidence that Hotshot Bedbug and Flea Fogger . . . [was] ineffective as [a] bed bug control agent[]."

5.      Plaintiff is a purchaser of the Product who assert claims for (i) violation of New York's General Business Law § 349, (ii) violation of New York's General Business Law § 350; (iii) breach of express warranty, (iv) breach of the implied warranty of merchantability, (v) unjust enrichment, and (vi) fraud.

## PARTIES

6.      Plaintiff Jon Martin is a citizen of New York who resides in Poughkeepsie, New York.  Mr. Martin purchased the Product from Walgreens in or around December 2023 for approximately $14.00.  Prior to purchasing the Product, Mr. Martin carefully read the Product's labeling, including the representation that it "KILLS BED BUGS."  Mr. Martin understood these statements to mean that the Product would, in fact, kill bed bugs when used as directed and relied on those representations in that he would not have purchased the Product at all or would have only been willing to pay a substantially reduced price for the Product had he known that the label representations were false and misleading.  In short, the Product was worthless because it is ineffective in killing bed bugs commonly found in homes and therefore Plaintiff Martin was damaged in the amount of the full purchase price of Product.  At minimum, there is a significant difference between the purchase price of the Product and its actual value, which damaged Plaintiff Martin.  Each time Plaintiff Martin used the Product, he used it as directed on the label.  The Product failed to remediate his bedbug issue.  Plaintiff Martin purchased the Product for personal use.

7.      Defendant United Industries Corporation is a Delaware corporation with its principal place of business in Earth City, Missouri. Defendant United Industries Corporation, a subsidiary of Spectrum Brands, is a leading manufacturer of consumer pest control products in the United States.  Defendant United Industries Corporation manufactures the Product under the Hot Shot brand name.

8. Defendant Spectrum Brands, Inc. is a Delaware corporation with its principal place of business in Middleton, Wisconsin. Defendant Spectrum Brands, Inc. is a leading supplier of consumer pest control products throughout the United States. Defendant Spectrum Brands, Inc. markets and distributes the Product throughout the United States.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

10. This Court has personal jurisdiction over Defendants because Defendants conduct business in New York. Defendants have marketed, promoted, distributed, and sold the Product in New York, rendering exercise of jurisdiction by New York courts permissible.

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## FACTS COMMON TO ALL CLAIMS

I. **Scientific Studies Establish That Defendants' Product Does Not Work for Its Advertised Purpose of Killing Bed Bugs**

12. The Product is a bedbug fogger, meaning that it is designed to be used by being placed in a room in which bedbugs or other relevant pests are present and allowed to disperse the active ingredient through an aerosol mist for a specified treatment period. The main active ingredients in the Product are aerosolized pyrethrins/pyrethroids.

13. In 2012, Dr. Susan C. Jones and Joshua L. Bryant of the Department of Entomology at The Ohio State University published the results of a study analyzing the effectiveness of Defendants' Product in a paper entitled *Ineffectiveness of Over-the-Counter*

4

*Total-Release Foggers Against the Bed Bug (Heteroptera: Cimicidae)*.

14. The study concluded that bed bugs "showed little, if any, adverse effects after [two hours of] direct exposure to the aerosolized pyrethroid(s) from" the "Hotshot Bedbug and Flea Fogger" (i.e. the Product). In other words, field-collected beg bugs (i.e. those that would be found in an average consumer's home), showed little to no adverse effects after direct exposure to the Product, meaning that the bedbugs were placed in a dish in which they were directly exposed to the aerosol mist.

15. It gets worse. A consumer using the Product in the real world will likely use it in bedroom or other room that has furniture, which permits the bedbugs opportunity for harborage such that they can avoid direct exposure to the aerosol mist. Under conditions where the bedbugs were provided with optional harborage (i.e. closer to a real-world setting), mortality was reduced even further. Even the Harlan strain of bedbugs, which have a natural susceptibility to pyrethroids (such that they were used as an internal control for the experiment) were unaffected by the Product when "covered by a thin cloth layer that provided harborage."

16. Based on their investigation, the authors provided the following conclusion:

> In residences and other settings, the majority of bed bugs hide in protected sites where they will not be directly contracted by the insecticide mist from foggers. This study provides the first scientific data supporting the position that total-release foggers should not be recommended for control of bed bugs, because 1) many field-collected bed bugs are resistant to pyrethroids, and they are not affected by brief exposure to low concentrations of pyrethrins and/or pyrethroids provided by foggers; and 2) there is minimal, if any, insecticide penetration into typical bed bug harborage sites. This study provides strong evidence that Hotshot Bedbug and Flea Fogger . . . w[as] ineffective as [a] bed bug control agent[].

17. As it relates to the methodology of the study, the researchers collected five bedbug populations from homes in Columbus, Ohio on which to test the efficacy of the Product: EPM, King, Kingry, Marcia, and Pointe. Harlan strain bedbugs (susceptible to pyrethroids) were

used as an internal control.

18. The test was conducted in three rooms in a vacant office building on the Ohio State campus using three separate fogger products, including Defendants' Product.

19. Bedbugs were first placed in a petri dish and then in two separate pools with a fogger product placed on a crate between the pools. The researchers then precisely followed the directions on the Product's label and activated the fogger for a two-hour treatment period, and then the room was opened and allowed to ventilate for 30 minutes. Two separate experiments were conducted, the first involved the bedbugs being directly exposed to the insecticide in "open, unprovisioned petri dishes." In the second experiment, the bedbugs were "placed in petri dishes provisioned with a . . . filter paper disc . . . that bed bugs could hide underneath (optional harborage)." The optional harborage experiment is more analogous to use in a home setting.

20. The Product "was evaluated against all six populations of bed bugs."

> For the Hotshot Fogger, 10 replicates, 5 consisting of 5 mixed-sex adults and 5 consisting of 5 mixed-stage nymphs, were established for each of 24 treatments: 6 bed bug populations x 2 harborage conditions x 2 treatments (fogger and control). Hence, a total of 1,200 bed bugs was used in this set of bioassays to evaluate the Hotshot Fogger.

21. For the Product only, the researchers also compared direct exposure versus forced harborage. "In direct exposure tests, each cylindrical plastic container with bed bugs was kept uncovered; in forced harborage tests, each container was covered with a single layer of light-weight cotton broadcloth fabric . . . held in place by a rubber band."

> Two bed bug populations (EPM and Harlan) were exposed to the Hotshot Fogger; 10 replicates (5 consisting of 10 mixed-sex adults and 5 consisting of 10 mixed-stage nymphs) were established for each of eight treatment combinations (2 populations x 2 harborage conditions x fogger and control). Hence, 800 bed bugs in total were used in this set of bioassays.

22. The condition of the bed bugs was assessed at three different intervals: (1) upon

re-entry, (2) 24 hours after treatment, and (3) 5-7 days after treatment.

23.     As for the results, in the direct versus optional harborage experiment, "[a]ll five field-collected bed bug populations showed little, if any, adverse effects after 2 h of direct exposure to aerosolized pyrethroids from the Hotshot Fogger."  Field-collected bedbugs exhibited low mortality regardless of observation time.

24.     Even for Harlan strain bedbugs, which are susceptible to pyrethroids, the availability of optional harborage significantly reduced acute mortality.  In addition, the researchers noted that "it is highly unlikely that any field population would be as susceptible as the Harlan strain . . . [b]ecause resistance is widespread in field-collected bed bug populations." In other words, bedbugs with pyrethroid resistance are the ones that would commonly be found in a consumer's home, rendering the Product ineffective.  Indeed, the researchers concluded that "pyrethrin- and pyrethroid-based foggers will have little, if any, impact on modern-day bed bug infestations."

25.     The researchers further noted that the "Hotshot Fogger was ineffective against field-collected bed bugs despite the presence of piperonyl butoxide, an insecticide synergist that has been shown to somewhat improve product efficacy in pyrethroid-resistant bed bugs."

26.     Another important point made by the researchers was that in "residences and other settings, the majority of bed bugs hide in protected sites" (i.e. harborage), rendering the Product completely ineffective for real-world use.

27.     The researchers concluded:

> The public is ill-served when products do not perform in accordance with labeling and use directions claims.  The use of ineffective insecticide products means that people are wasting money, and they are delaying effective treatment of insect pests whose populations are ever increasing in their residence and likely spreading to others.  Furthermore, insecticides are unnecessarily being introduced into the environment, and people (and insects) are being exposed to insecticide residues, while further reinforcing

7

>insecticide resistance in insects.
>
>. . .
>
>In conclusion, our study provides strong evidence that Hotshot Bedbug and Flea Fogger [is] ineffective as [a] bed bug control agent[]. The low concentrations of pyrethrins, pyrethroids, or both, and the brief exposure provided by these total-release foggers had little impact on modern-day bed bugs. Our data also support the position that currently marketed total-release foggers should not be recommended for treating bed bug infestations because these products provide no residual and they allow for minimal, if any, insecticide penetration into typical bed bug harborage sites.

28. The Ohio State researchers are not alone in their conclusions. Indeed, for years, scientists have agreed that foggers like the Product should not be recommended for control of household pests because there is minimal penetration of the insecticide into pest harborage sites.

29. In 1999, Michael F. Potter of the University of Kentucky explained:

>Most foggers are designed to be placed in the center of a room on a chair or table, and activated by depressing or removing a tab at the top of the can. The entire contents are released upwards, into the airspace, where the aerosol droplets remain suspended for a period of time and then gradually settle onto floors, counter tops and other surfaces. Prior to application, drawers, cabinets and closets are supposed to be opened to enhance coverage in areas where pests are likely to be hidden. When applied in this manner, very little insecticide actually penetrates into cracks, voids, and other secluded locations where cockroaches, ants, bed bugs, and most other household pests congregate and spend most of their time.
>
>Many insect foggers contain pyrethrin as an active ingredient. While pyrethrins are somewhat effective against exposed flying insects such as house flies, they are seldom lethal to roaches, ants, bed bugs, spiders, silverfish, and other crawling pests. The ingredients within 'bug bombs' also tend to be repellent, causing insects to scatter and move deeper into walls, crevices, and other hard-to-reach areas.

30. The United States Environmental Protection Agency ("EPA") agrees:

>Bed bugs often hide, especially during the day. Foggers should not be used as the sole source of bed bug control. The pesticides used in total release foggers must contact the pest to kill it. If the material does not reach the cracks and crevices where bed bugs are hiding, they will not be killed.

31. Further, the Washington State Department of Health has stated: "Foggers don't work when trying to get rid of bed bugs and other insects that hide. Foggers only treat exposed surfaces where the pesticide lands. If the pest is hiding under furniture or in cracks, it can avoid contact with the pesticide. Pests also build up resistance to pesticides."

**II.     Defendants Make False and Misleading Claims that the Product "KILLS BED BUGS" Even Though the Scientific Evidence Conclusively Proves Otherwise**

32. Despite the scientific evidence set forth above, Defendants have continued to falsely and misleadingly represent that the Product "KILLS BED BUGS."

33. Defendants make these false and misleading representations prominently on the front packaging of the Product, suggesting to a reasonable consumer that the Product would, in fact,



kill bed bugs.

34. The Product's packaging contains numerous false and misleading elements, including: 1) the Product is called "BEDBUG & FLEA FOGGER" suggesting to a reasonable

9

consumer that the Product has specific efficacy for eradicating bedbugs, which the science has proven it does not; 2) the Product prominently features a picture of a bedbug, further suggesting to a reasonable consumer that the Product has specific efficacy for eradicating bedbugs, which the science has proven it does not; and 3) the Product's packaging specifically states that it "KILLS BED BUGS" is large bolded letters, which is a false and misleading statement.

35. The phrase "KILLS BED BUGS" also creates an express warranty.

36. Given that experts in the field have published information since the 1990s regarding the inefficacy of fogger products like the Product and given that the 2012 study conclusively demonstrated that Defendants' Product does not work, Defendants knew or should have known that their representations were false, but they continued to knowingly misrepresent the Product to consumers.

## CLASS REPRESENTATION ALLEGATIONS

37. Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Product (the "Class"). Specifically excluded from the Class are persons who made such purchase for the purpose of resale, Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

38. Plaintiff also seeks to represent a subclass defined as all Class members who purchased the Product in New York (the "New York Subclass").

39. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or

amended complaint.

40.     **Numerosity.**  Members of the Class and New York Subclass are so numerous that their individual joinder herein is impracticable.  Upon information and belief, members of the Class and New York Subclass number in the hundreds of thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

41.     **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to, the following:

(a)     whether Defendants' labeling, marketing and promotion of the Product is false and misleading;

(b)     whether Defendants knew or should have known that its labeling, marketing and promotion of the Product is false and misleading;

(c)     whether Defendants' representation that the Product "KILLS BED BUGS" formed an express warranty; and

(d)     whether Plaintiff and the Class have sustained monetary loss and the proper measure of that loss.

42.     **Typicality.**  The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff was exposed to Defendants' false and misleading marketing and promotional materials and representations, purchased the Product, and suffered a loss as a result of that purchase.

43.     **Adequacy of Representation.**  Plaintiff is an adequate representative of the Class and New York Subclass because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting

class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

44. **Superiority.** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Deceptive Acts Or Practices, New York Gen. Bus. Law § 349

45. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

46. Plaintiff brings this claim individually and on behalf of members of the New York Subclass against Defendants.

47. By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices by making false and/or misleading representations on the label of the Products. Specifically, Defendants falsely and misleadingly represented that the Product "KILLS BED BUGS" when scientific studies have proven that the Product is ineffective in killing bedbugs and is especially ineffective in a real-world environment.

48. Other misleading representations include: 1) the Product is called "BEDBUG &

FLEA FOGGER" suggesting to a reasonable consumer that the Product has specific efficacy for eradicating bedbugs, which the science has proven it does not; and 2) the Product prominently features a picture of a bedbug, further suggesting to a reasonable consumer that the Product has specific efficacy for eradicating bedbugs, which the science has proven it does not.

49. The foregoing deceptive acts and practices were directed at consumers.

50. The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the ability of the Product to kill bedbugs.

51. Plaintiff and members of the New York Subclass were injured as a result because (a) they would not have purchased the Product if they had known that the Product was ineffective in killing bedbugs, and (b) they overpaid for the Product on account of the misrepresentations that it "KILLS BED BUGS." In short, the Product is worthless because it is ineffective in killing bed bugs commonly found in homes and therefore Plaintiff was damaged in the amount of the full purchase price of Product. At minimum, there is a significant differential in value between the purchase price of the Product and its actual worth, resulting in damage to Plaintiff.

52. On behalf of himself and other members of the New York Subclass, Plaintiff seeks to recover his actual damages or fifty dollars, whichever is greater, three times actual damages, reasonable attorneys' fees and costs, and an order enjoining Defendants' deceptive conduct, and any other just and proper relief available under Section 349 of the New York General Business Law.

### COUNT II
### False Advertising, New York Gen. Bus. Law § 350

53. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

54. Plaintiff brings this claim individually and on behalf of members of the New York

Subclass against Defendants.

55. Based on the foregoing, Defendants have engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law by misrepresenting that the Product is effective in killing bedbugs. Specifically, Defendants falsely and misleadingly represented that the Product "KILLS BED BUGS" when scientific studies have proven that the Product is ineffective in killing bedbugs and is especially ineffective in a real-world environment (the "misrepresentation").

56. The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

57. Defendants' misrepresentation has resulted in consumer injury or harm to the public interest.

58. As a result of this misrepresentation, Plaintiff and members of the New York Subclass have suffered economic injury because (a) they would not have purchased the Product if they had known that the Product was ineffective in killing bedbugs, and (b) they overpaid for the Product on account of the misrepresentation. In short, the Product was worthless because it is ineffective in killing bed bugs commonly found in homes and therefore Plaintiff was damaged in the amount of the full purchase price of Product. At minimum, there is a significant differential in value between the purchase price of the Product and its actual worth, resulting in damage to Plaintiff.

59. On behalf of himself and other members of the New York Subclass, Plaintiff seeks to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs, and an order enjoining Defendants' deceptive conduct, and any other just and proper relief available under Section 350 of the New

York General Business Law.

## COUNT III
### Breach of Express Warranty

60.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

61.     Plaintiff brings this claim individually and on behalf of members of the Class and New York Subclass against Defendants.

62.     In connection with the sale of the Product, Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers issued written warranties by representing that the Product "KILLS BED BUGS."

63.     In fact, the Product does not conform to the above-referenced representations because the Product is ineffective for killing bedbugs.

64.     Plaintiff and the Class performed all conditions precedent to Defendants' liability under this contract when they purchased the Product.

65.     Plaintiff and the members of the proposed Class and the New York Subclass were injured as a direct and proximate result of Defendants' breach because (a) they would not have purchased the Product if they had known that the Product was ineffective in killing bedbugs, and (b) they overpaid for the Product on account of the misrepresentation that it "KILLS BED BUGS."

66.     As a result of Defendants' breaches of express warranty, Plaintiff and each of the members of the Class have been damaged in the amount of the purchase price of the Product (or the differential between the purchase price and the true value of the Product) and any consequential damages resulting from the purchases.

67.     Plaintiff's counsel notified Defendants of their claims in a demand letter that

complied in all respects with U.C.C. §§ 2-313, 2-607, sent via Certified Mail - Return Receipt Requested, on January 16, 2024.

## COUNT IV
**Breach of the Implied Warranty of Merchantability**

68. Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

69. Plaintiff bring this claim individually and on behalf of the members of the proposed Class and New York Subclass against Defendants.

70. Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers of the Product, impliedly warranted that the Product was effective for its intended purpose of killing bed bugs.

71. Defendants breached the warranty implied in the contract for the sale of the Product because the Product could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose because the Product was ineffective for its intended purpose of killing bedbugs. As a result, Plaintiff and Class members did not receive the goods as impliedly warranted by Defendants to be merchantable.

72. The Products were not altered by Plaintiff or Class members.

73. The Products were defective when they left the exclusive control of Defendants.

74. Defendants knew that the Products would be purchased and used without additional testing by Plaintiff and Class members.

75. The Products were unfit for their intended purpose, and Plaintiff and Class members did not receive the goods as warranted.

76. As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class members have been injured and harmed because: (a) they would not have

purchased the Product on the same terms if they knew that the Product was ineffective in killing bedbugs; and (b) the Product did not have the characteristics, ingredients, uses, or benefits as promised by Defendants.

### COUNT V
### Unjust Enrichment

77. Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

78. Plaintiff brings this claim individually and on behalf of members of the Class and New York Subclass against Defendants.

79. Plaintiff and Class members conferred benefits on Defendants by purchasing the Products.

80. Defendants have knowledge of such benefits.

81. Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and members of the proposed Class and the New York subclass' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because Defendants misrepresented that the Product "KILLS BED BUGS" when scientific evidence has proven the Product is ineffective in killing bedbugs.

82. Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the proposed Class and the New York Subclass is unjust and inequitable, Defendants must pay restitution to Plaintiff and the members of the proposed Class and the New York subclass for their unjust enrichment, as ordered by the Court.

## COUNT VI
**Fraud**

83. Plaintiff hereby incorporate by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

84. Plaintiff bring this claim individually and on behalf of the members of the proposed Class and New York Subclass against Defendants.

85. As discussed above, Defendants misrepresented on the Product's packaging that it "KILLS BED BUGS" when scientific evidence has proven the Product is ineffective in killing bedbugs.

86. The false and misleading representations and omissions were made with knowledge of their falsehood.  Defendants are top distributors of insecticide products in the United States and are undoubtedly aware of the studies finding that their Product does not work. Nonetheless, Defendants continue to sell the ineffective and worthless Product to unsuspecting consumers.

87. The false and misleading representations and omissions were made by Defendants, upon which Plaintiff and members of the proposed Class and New York Subclass reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and members of the proposed Class and New York Subclass to purchase the Products.

88. The fraudulent actions of Defendants caused damage to Plaintiff and members of the proposed Class and New York Subclass, who are entitled to damages and other legal and equitable relief as a result.

**RELIEF DEMANDED**

89. WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

a. For an order certifying the nationwide Class and the New York Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and New York Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and New York Subclass members;

b. For an order declaring that Defendants' conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiff, the nationwide Class, and the New York Subclass on all causes of action asserted herein;

d. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief;

g. For an order enjoining Defendants from continuing the illegal practices detailed herein and compelling Defendants to undertake a corrective advertising campaign; and

h. For an order awarding Plaintiff and the Class and New York Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: January 19, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ *Joshua D. Arisohn*
    Joshua D. Arisohn

Joshua D. Arisohn
1330 Avenue of the Americas, 32 Fl.
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com

*Attorneys for Plaintiff*